# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HAVERHILL RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

HAVERHILL RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

ICONIX BRAND GROUP, INC., NEIL COLE, WARREN CLAMEN, JEFF LUPINACCI, and DAVID BLUMBERG

Defendants.

No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

<u>JURY TRIAL DEMANDED</u>

Plaintiff Haverhill Retirement System ("Haverhill" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Iconix Brand Group, Inc. ("Iconix" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>INTRODUCTION</u>

1.     This is a federal securities class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly-traded securities of Iconix between February

20, 2013 and August 7, 2015, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Iconix and certain of its officers and/or directors.

2. Iconix is a brand management company and owner of a diversified portfolio of global consumer brands across fashion, sports, entertainment and home segments. Iconix purports to specialize in marketing, merchandising, and licensing its brand portfolio, with over 1,100 licenses with retailers and manufacturers worldwide that sell across various distribution channels from the mass tier to the luxury market.

3. The Company's business strategy is to maximize the value of its brands primarily through strategic licenses and joint venture partnerships around the world, as well as to grow the portfolio of brands through strategic acquisitions.

4. The Company operates through an "asset-light" brand-management system geared toward generating revenue streams through the licensing of intellectual property rights without large outlays of cash for inventory or property, plant, and equipment. Iconix typically purchases the licensing rights ("Licensing Rights") to an existing consumer fashion brand for a fixed acquisition cost (or cost basis), and licenses the right to use the brand through a series of agreements with various partners and joint ventures in exchange for licensing fees.

5. During the Class Period, the Company consistently reported "record" revenue, earnings per share ("EPS"), and free cash flow results, with rapidly increasing equity earnings on joint ventures investments, on a quarter-over-quarter basis. Unbeknownst to investors, however, Defendants (defined herein) were violating the federal securities laws by underreporting the cost basis of certain Licensing Rights acquisitions and engaging in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic

growth.  As a result of Defendants' deceptive accounting practices, as described herein, the

Company overstated its financial results and performance, causing Iconix's securities to trade at

artificially inflated prices, reaching a Class Period high closing price of $44.22 per share on June

9, 2014.

6.      The true state of the Company's specious accounting practices was revealed

through a series of partial disclosures and conspicuously-timed executive resignations.  On

December 14, 2014, *Off Wall Street*[1] published a research note initiating a "sell"

recommendation on Iconix shares citing organic sales declines in core portfolio brands and

"questionable" accounting practices.

7.      On this news, Iconix's stock price dropped $2.39 per share, or 6.09 percent, to

close at $36.86 per share on December 15, 2014 on unusually high volume.

8.      On March 30, 2015 after the close of the trading session, the Company announced

in a press release that its Chief Financial Officer ("CFO"), Jeff Lupinacci ("Lupinacci"), had

resigned effective March 30, 2015.  The Company stated in relevant part:

> On March 24, 2015, Jeff Lupinacci, the Chief Financial Officer of Iconix Brand
> Group, Inc. (the "Company") notified the Company of his intention to resign,
> with 60 days' notice, to pursue another business opportunity. The Company has
> determined to make such resignation effective March 30, 2015. The Company has
> commenced a search for Mr. Lupinacci's replacement and anticipates filling the
> position in the near term.

9.      On this news, Iconix's stock price dropped $2.72 per share, or 7.47 percent, to

close at $33.67 per share on March 31, 2015 on unusually high volume.

10.     On April 13, 2015, the first in a series of three articles about Iconix was published

on the investor news site *Seeking Alpha*.  The article alleged that the Company's revenue and

---

[1] *Off Wall Street* is a Massachusetts-based research firm that provides sell recommendations for money managers.

earnings growth has been driven by increasing sales of assets and "non-cash gains" from book value adjustments and that operating cash flow was declining.

11.     On April 15, 2015, just before the market closed, a second article about Iconix was published on *Seeking Alpha*, alleging that the Company was overstating its organic growth rate.

12.     On this news, shares of Iconix declined $1.27 per share from $33.30 per share on April 15, 2015, to close on April 17, 2015 at $32.03 per share, a two-day decline of nearly 4 percent on unusually heavy volume.

13.     On April 17, 2015, towards the end of the trading day, *Seeking Alpha* published the third and final article about Iconix, alleging in detail how the majority of the Company's brands have diminished in value since Iconix acquired them.

14.     Additionally, on April 17, 2015, after the market closed, Iconix announced that the Company's Chief Operating Officer ("COO") had resigned after only serving for approximately one year.  The Company stated that it did not intend to name a new COO.

15.     Thereafter, on April 20, 2015, Roth Capital Partners published an Equity Research Note titled, "ICON: COO Departure Creates Greater Uncertainty; Lowering Target To $36."  The Note discussed certain accounting uncertainties surrounding the Company's prior reporting of free cash flow and practice of booking joint venture gains as revenue.

16.     On these disclosures, shares of Iconix declined $6.62 per share, or 20.67 percent, to close at $25.41 per share on April 20, 2015 on unusually heavy volume.

17.     Thereafter, on August 6, 2015, after the close of the trading session, the Company announced in a press release that its founder and Chief Executive Officer ("CFO"), Neil Cole

("Cole"), had resigned effective immediately.  According to the press release, Cole served as the Company's CEO, Chairman, and President since he founded Iconix in 2005.

18.     On this news, Iconix's stock price dropped $4.68 per share, or 23.88 percent, to close at $14.92 per share on August 7, 2015 on unusually high volume.

19.     Finally, on August 10, 2015, prior to the open of the trading session, Iconix released disappointing results for the second quarter ended June 30, 2015 and drastically cut its full year sales guidance.  Specifically, quarterly revenues missed consensus estimates by 14 percent, and quarterly earnings missed by 13 percent.

20.     In connection with its results, Iconix also reported that the SEC has been inquiring about the Company's accounting for joint venture transactions.  In an accompanying press release, the Company disclosed that the SEC was reviewing its "accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results."  Iconix also revealed that its board had formed an independent committee to review this questionable accounting.  The Company warned that it may ultimately be forced to reverse certain gains it had recognized on its historical joint venture transactions and that the specific amounts that could be reversed as a result of improper accounting were estimated to be $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012.

21.     In reaction to these revelations, Iconix's stock price declined $0.35 per share, or 2.3 percent, to close at $14.57 per share on August 10, 2015 on extremely high volume.

22.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company had underreported the cost basis of the Licensing Rights to certain brands;

(b)     the Company engaged in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic growth;

(c)     as a result, the Company's earnings and revenues were overstated; and

(d)     as a result of the foregoing, Defendants' statements about the Company's business, operations, and future business prospects were materially false and misleading and/or lacked a reasonable basis.

23.     As a result of Defendants' false statements, Iconix's securities traded at artificially inflated prices during the Class Period.  However, as the truth about Iconix's accounting practices was gradually revealed to investors, the Company's share price dramatically declined.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 (15 U.S.C. § 78a(a)).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Iconix's principal executive offices are located within this Judicial District.

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

28.     Haverhill, a contributory retirement system for public employees in Haverhill, Massachusetts, purchased the common stock of Iconix during the Class Period, as set forth in the certification attached hereto, and was damaged as a result of Defendants' wrongdoing as alleged in this complaint.

29.     Defendant Iconix is a Delaware corporation with its principal executive offices located at 1450 Broadway, New York, New York 10018.  The Company's stock is listed on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "ICON."

30.     Defendant Neil Cole was, at all relevant times, CEO, Chairman, President, and a member of the board of directors for Iconix, until his resignation on August 6, 2015.

31.     Defendant Warren Clamen ("Clamen") was CFO of Iconix until his resignation on March 18, 2014.

32.     Defendant Jeff Lupinacci was CFO of Iconix from April 7, 2014 until his resignation on March 30, 2015.

33.     Defendant  David Blumberg ("Blumberg") served as an Executive Vice President – Head of Strategic Development and Interim Chief Financial Officer effective March 30, 2015.

34.     Defendants Cole, Clamen, Lupinacci, and Blumberg are collectively referred to herein as the "Individual Defendants."  Together with Defendant Iconix, the Individual Defendants are collectively referred to herein as "Defendants."

35.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Iconix, were privy to confidential and proprietary information concerning Iconix, accounting practices related to Licensing Rights acquisitions, booking joint venture revenues and profits, free-cash flow, and the prospects for organic growth.  The Individual Defendants also had access to material adverse, non-public information concerning Iconix, as discussed in detail below.  Because of their positions with Iconix, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and through reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public

36.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Iconix's business.

37.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Iconix's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press

8

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability

and opportunity to prevent their issuance or cause them to be corrected.  Because of their

positions with the Company, and their access to material, non-public information, the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to and were being

concealed from the public, and that the positive representations being made were then materially

false and misleading.  The Individual Defendants are liable for the false statements pleaded

herein.

38.     As senior executive officers and/or directors and as controlling persons of a

publicly-traded company whose common stock is registered with the SEC, traded on the

NASDAQ, and governed by the federal securities laws, the Individual Defendants had a duty to

promptly disseminate accurate and truthful information with respect to Iconix's business,

accounting practices and future business prospects, and to correct any previously issued

statements that had become materially misleading or untrue so that the market price of Iconix's

common stock would be based upon truthful and accurate information.  The Individual

Defendants' misrepresentations and omissions during the Class Period violated these specific

requirements and obligations.

## **BACKGROUND**

39.     Iconix is a brand management company and owner of a diversified portfolio of 35

global consumer brands across women's, men's, entertainment and home.  The Company's

business strategy is to maximize the value of its brands primarily through strategic licenses and

joint venture partnerships around the world, as well as to grow the portfolio of brands through

strategic acquisitions.

40.     The Company's brand portfolio includes Candie's [®], Bongo [®], Badgley

Mischka [®], Joe Boxer [®], Rampage [®], Mudd [®], London Fog [®], Mossimo [®], Ocean Pacific/OP [®],

Danskin/Danskin Now ®, Rocawear ® /Roc Nation ®, Cannon ®, Royal Velvet ®, Fieldcrest ®,
Charisma ®, Starter ®, Waverly ®, Ecko Unltd ® /Mark Ecko Cut & Sew ®, Zoo York ®, Sharper
Image ®, Umbro ® and Lee Cooper ®; and interest in Artful Dodger ®, Material Girl ®, Peanuts ®,
Ed Hardy ®, Truth or Dare ®, Billionaire Boys Club ®, Ice Cream ®, Modern Amusement ®,
Buffalo ®, Nick Graham ® and Hydraulic®.

41.     The Company looks to monetize the Intellectual Property (herein referred to as
"IP") related to its Licensing Rights of brands throughout the world and in all relevant categories
through various methods, including (i) licensing directly with leading retailers, (ii) consortia of
wholesale licensees, (iii) joint ventures in specific territories, and (iv) "Other" activity such as
corporate sponsorships and content, and the sale of the IP Licensing Rights for specific
categories or territories.

42.     Products bearing the Company's brands are sold across a variety of distribution
channels from the mass tier to the luxury market.  The licensees are responsible for designing,
manufacturing and distributing the licensed products.  The Company supports its brands with
advertising and promotional campaigns designed to increase brand awareness. Additionally the
Company provides its licensees with coordinated trend direction to enhance product appeal and
help build and maintain brand integrity.

43.     Globally, the Company has over 50 direct-to-retail licenses and more than 1,100
total Licensing Rights.  The Company's Licensing Rights typically require the licensee to pay
the Company royalties based upon net sales with guaranteed minimum royalties in the event that
net sales do not reach certain specified targets.  As of January 1, 2015, the Company purportedly
had over $800 million of aggregate guaranteed royalty revenue over the terms of its existing
contracts excluding renewals.

44.     A key initiative in the Company's global brand expansion plans has been the formation of international joint ventures. The Company's primary purpose in forming international joint ventures is to bring its brands to market more quickly and efficiently, generating greater short- and long-term value from its IP than the Company believes is possible if it were to build-out wholly-owned operations on its own across a multitude of regional or local offices.  Through December 31, 2014, the Company formed the following joint ventures to develop and market its brands in specific international markets:

| Date Created | Investment /Joint Venture | Iconix's Interest |
|---|---|---|
| September 2008 | Iconix China | 50% |
| December 2009 | Iconix Europe[(1)] | 51% |
| May 2012 | Iconix India | 50% |
| June 2013 | Iconix Canada | 50% |
| September 2013 | Iconix Australia | 50% |
| October 2013 | Iconix Southeast Asia | 50% |
| December 2013 | Iconix Israel | 50% |
| December 2014 | Iconix Middle East | 50% |

45.     According to Iconix, the formation and administration of the international joint ventures have been a central and ongoing component of the Company's business since 2008.

46.     Additionally, the Company's goal of maximizing the value of its IP also includes the sale to third parties of a brand's Licensing Rights in specific territories or categories. Accordingly, the Company evaluates potential offers to acquire some or all of a brand's IP by comparing whether the offer is more valuable than the Company's estimate of the current and potential revenue streams to be earned via the Company's traditional licensing model.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS DURING THE CLASS PERIOD**

47.     The Class Period begins on February 20, 2013, when Iconix issued a press release announcing its financial results for the fourth quarter ("Q4") and fiscal year ("FY") ended December 31, 2012.  Therein, the Company announced Q4 and FY 2012 revenue of $85.1 million and $353.8 million, respectively; Q4 and FY 2012 non-GAAP diluted EPS of $0.41 and

$1.70, respectively; and Q4 and FY 2012 free cash flow of $37.9 million and $180.5 million, respectively.  Additionally, the Company reported equity earnings on joint ventures of approximately $6.7 million for Q4 and $10.9 million for FY 2012.  CEO Cole commented on the Company's performance, stating in part:

> Over the past year we have executed on several exciting initiatives that position our company for significant growth. We acquired three iconic brands, continued to expand our global footprint, signed a Peanuts movie deal and launched a new $1.1 billion securitization facility. ***Looking to 2013 and beyond, with our powerful portfolio of over 30 brands that are well diversified across numerous industries and geographies along with our strong balance sheet and financial flexibility, we look forward to delivering continued growth and value to our shareholders***.

48.    On February 28, 2013, Iconix filed its Annual Report with the SEC on Form 10-K for the 2012 fiscal year.  The Company's Form 10-K was signed by defendants Cole and Clamen, and reaffirmed the Company's statements previously announced on February 20, 2013. The Form 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by defendants Cole and Clamen, who certified the following:

> 1. I have reviewed this Annual Report on Form 10-K for the period ended December 31, 2012 of Iconix Brand Group, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

49.     On April 24, 2013 Iconix issued a press release announcing its financial results

for the first quarter ended March 31, 2013.  Therein, the Company announced "[r]ecord" Q1

revenue of $105.1 million, a 19% increase over prior year quarter; "[r]ecord" Q1 non-GAAP diluted EPS of $0.54, a 26% increase over prior year quarter; and "[r]ecord" Q1 free cash flow of $51.8 million and EBITDA of $64.6 million.  Additionally, the Company reported equity earnings on joint ventures of approximately $2 million for Q1.  CEO Cole commented on the Company's performance, stating in part:

> With record results in the first quarter, 2013 is off to a strong start and we are on track to deliver over 20% revenue and EPS growth for the full year. We successfully completed three acquisitions in the past five months and with our current pipeline we believe there are additional opportunities, which would continue to enhance our portfolio. ***As we look ahead, we are also focused on continuing to build our portfolio of brands organically through our global platform, and we believe that with our free cash flow and strong balance sheet we will continue to create increased shareholder value***.

50.     On May 7, 2013, Iconix filed its Quarterly Report with the SEC on Form 10-Q for the 2013 first quarter.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's statements previously announced on April 24, 2013.  The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

51.     On July 24, 2013, Iconix issued a press release announcing its financial results for the second quarter ended June 30, 2013.  Therein, the Company announced "[r]ecord" Q2 revenue of $115.1 million vs. $93.6 million in prior year quarter, a 23% increase; "[r]ecord" Q2 non-GAAP diluted EPS of $0.72 vs. $0.45 in prior year quarter, a 60% increase; and free cash flow for the second quarter of approximately $60.8 million, a 17% increase as compared to the prior year quarter of approximately $51.9 million.  Additionally, the Company reported equity earnings on joint ventures of approximately $2.3 million for Q2.  The press release also announced the formation of Iconix's new Canadian joint venture, stating, that "[i]ncluded in the

second quarter and year-to-date results ended June 30, 2013, is the formation of a new joint venture in Canada, which contributed approximately $9.8 million to revenue."

52.     On August 9, 2013, Iconix filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's statements previously announced on July 24, 2013. The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

53.     On October 29, 2013, Iconix issued a press release announcing its financial results for the third quarter ended September 30, 2013.  Therein, the Company announced "[r]ecord" Q3 revenue of $107.2 million vs. $86.6 million in prior year quarter, a 24% increase; "[r]ecord" Q3 non-GAAP diluted EPS of $0.59 vs. $0.41 in prior year quarter, a 44% increase; and free cash flow for the third quarter of approximately $54.3 million, a 26% increase as compared to the prior year quarter of approximately $43.2 million.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.4 million for Q3.  The press release also announced the formation of Iconix's new Australian joint venture, stating, that "[i]ncluded in the third quarter and year-to-date results, is the formation of a new joint venture in Australia, which contributed approximately $5 million to revenue."

54.     On November 6, 2013, Iconix filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's statements previously announced on October 29, 2013.  The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

55. On February 20, 2014, Iconix issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2013. For the fourth quarter, the Company announced "[r]ecord" Q4 revenue of $105.3 million, a 24% increase over prior year quarter; "[r]ecord" Q4 non-GAAP diluted EPS of $0.54, a 32% increase over prior year quarter; and "[r]ecord" Q4 free cash flow of $62.9 million, a 66% increase over prior year quarter. For the year, the Company announced "[r]ecord" 2013 revenue of $432.6 million, a 22% increase over prior year; "[r]ecord" 2013 non-GAAP diluted EPS of $2.39, a 41% increase over prior year; and "[r]ecord" 2013 free cash flow of $229.9 million, a 27% increase over prior year. Additionally, the Company reported equity earnings on joint ventures of approximately $4.5 million for Q4 and $12.1 million for FY 2013. CEO Cole commented on the Company's performance, stating in part:

> Since converting to a licensing model in 2005, we have built a powerful global platform, delivering compounded annual growth of around 40% for both revenue and EPS. ***In 2013, we had another record year and continued to drive growth through the expansion of our worldwide footprint, our acquisition strategy of asset light businesses and global brands, and our ongoing commitment to share repurchases. Looking ahead, as we continue to focus on international markets and additional acquisitions, I believe we can build on our success and continue to deliver increased value to our shareholders***.

56. On February 27, 2014, Iconix filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year. The Company's Form 10-K was signed by defendants Cole and Clamen, and reaffirmed the Company's statements previously announced on February 20, 2014. The Form 10-K also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

57. On March 19, 2014, the Company announced in a press release that defendant Clamen was resigning from the Company as CFO, effective immediately. According to the press

release, the Company promoted Seth Horowitz to Chief Operating Officer, and Jeff Lupinacci to Chief Financial Officer.

58.     On April 30, 2014, Iconix issued a press release announcing its financial results for the first quarter ended March 31, 2014.  Therein, the Company announced "[r]ecord" Q1 revenue of $116.1 million, an 11% increase over prior year quarter; "[r]ecord" Q1 non-GAAP diluted EPS of $0.72, a 33% increase over prior year quarter; and "[r]ecord" free cash flow of $58.0 million, a 12% increase over prior year quarter.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.1 million for Q1.  CEO Cole commented on the Company's performance, stating in part:

> With record results in the first quarter, 2014 is off to a strong start. ***Through our diversified portfolio of brands and expanding global footprint we continued to achieve strong growth***. As we look ahead, we believe we can continue to deliver significant value to our Company and shareholders through a combination of organic growth driven by international expansion and Peanuts initiatives, as well as, additional acquisitions of global iconic brands.

59.     On May 9, 2014, Iconix filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.  The Company's Form 10-Q was signed by defendants Cole and Lupinacci, and reaffirmed the Company's statements previously announced on April 30, 2014.  The Form 10-Q also contained certifications signed by defendants Cole and Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

60.     On July 29, 2014, Iconix issued a press release announcing its financial results for the second quarter ended June 30, 2014.  Therein, the Company announced "[r]ecord" Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75; "[r]ecord" Q2 EBITDA of $78.2 million and Q2 EBITDA margin of 66%; and free cash flow for the second quarter of $60.0 million for Q2 and $118.0 million for six month period.  Additionally, the Company

reported equity earnings on joint ventures of approximately $5.7 million for Q2.  CEO Cole

commented on the Company's performance, stating in part:

> **With record results in the second quarter, we continue to demonstrate the power
> of our business model with our diversified revenue stream and strong free cash
> flow**. As we look to the future we believe we can continue to deliver significant
> growth and increased value for our Company and shareholders through our global
> expansion plans, worldwide Peanuts business and additional acquisitions of global
> iconic brands.

61.     On August 6, 2014, Iconix filed its Quarterly Report with the SEC on Form 10-Q

for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by defendants Cole

and Lupinacci, and reaffirmed the Company's statements previously announced on July 29,

2014.  The Form 10-Q also contained certifications signed by defendants Cole and Lupinacci

pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

62.     On October 28, 2014, Iconix issued a press release announcing its financial results

for the third quarter ended September 30, 2014.  Therein, the Company announced "[r]ecord" Q3

revenue of $113.8 million, a 6% increase over prior year quarter; "[r]ecord" Q3 diluted non-

GAAP EPS of $0.73, a 23% increase over prior year quarter; and free cash flow for the third

quarter of approximately $61.8 million, a 14% increase as compared to the prior year quarter of

approximately $54.3 million.  Additionally, the Company reported equity earnings on joint

ventures of approximately $4.1 million for Q3.  CEO Cole commented on the Company's

performance, stating in part:

> **Our strong third quarter and year to date results reflect the continued strength
> of our overall portfolio and the power of our business model. With solid brand
> performance domestically supported by large direct-to-retail licenses, and
> double digit growth around the world driven by our global brands and joint
> ventures, we continue to execute in line with our successful track record**. As we
> look to 2015, we expect to continue to drive positive organic growth, and with our
> strong balance sheet we plan to deliver additional value as we execute on our
> acquisition strategy and continue to opportunistically repurchase stock.

63.     On November 7, 2014, Iconix filed its Quarterly Report with the SEC on Form

10-Q for the 2014 fiscal third quarter.  The Company's Form 10-Q was signed by defendants

Cole and Lupinacci, and reaffirmed the Company's statements previously announced on October

28, 2014.  The Form 10-Q also contained certifications signed by defendants Cole and Lupinacci

pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

### Defendants' Accounting Improprieties Are Slowly Revealed Through Partial Disclosures

64.     On December 14, 2014, *Off Wall Street* published a research note initiating a

"sell" recommendation on Iconix shares citing organic sales declines in core portfolio brands and

"questionable" accounting practices.

65.     On this news, Iconix's stock price dropped $2.39 per share, or 6.09 percent, to

close at $36.86 per share on December 15, 2014 on unusually high volume.

66.     On February 26, 2015, Iconix issued a press release announcing its financial

results for the fourth quarter and fiscal year ended December 31, 2014.  For the fourth quarter,

the Company announced total revenue of $112.4 million, a 7% increase over prior year quarter;

diluted non GAAP EPS of $0.56, a 4% increase over prior year; and free cash flow of

approximately $46.3 million for the quarter, a 19% decrease as compared to the prior year

quarter.  For the year, the Company announced revenue of $461.2 million, a 7% increase over

prior year; diluted non GAAP EPS of $2.78, a 16% increase over prior year; and free cash flow

of approximately $174.3 million for 2014, a 26% decrease as compared to approximately $235.5

million in the prior year.  Additionally, the Company reported equity earnings on joint ventures

of approximately $4.15 million for Q4 and $17 million for FY 2014.   In connection with the

formation of joint ventures and sale of certain trademarks, the Company generated

approximately $51.2 million of notes receivable in 2014 as compared to approximately $15.8 million in 2013.

67.     Critically, the press release indicated that the Company had "revised" the free cash flow presentation for the quarter and fiscal year due to "[t]he increased number of joint venture transactions in 2014 has led to an increase in the receivable component of the Company's previous free cash flow calculation.  The revised free cash flow calculation includes only cash received in the period."

68.     On March 2, 2015, Iconix filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.  The Company's Form 10-K was signed by defendants Cole and Lupinacci, and reaffirmed the Company's statements previously announced on February 26, 2015.  The Form 10-K also contained certifications signed by defendants Cole and Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

69.     On March 30, 2015 after the close of the trading session, the Company announced in a press release that its Chief Financial Officer ("CFO"), Jeff Lupinacci ("Lupinacci"), had resigned effective March 30, 2015.  The Company stated in relevant part:

> On March 24, 2015, Jeff Lupinacci, the Chief Financial Officer of Iconix Brand Group, Inc. (the "Company") notified the Company of his intention to resign, with 60 days' notice, to pursue another business opportunity. The Company has determined to make such resignation effective March 30, 2015. The Company has commenced a search for Mr. Lupinacci's replacement and anticipates filling the position in the near term.

70.     On this news, Iconix's stock price dropped $2.72 per share, or 7.47 percent, to close at $33.67 per share on March 31, 2015 on unusually high volume.

71.     On April 13, 2015, the first in a series of three articles about Iconix was published on the investor news site *Seeking Alpha*, entitled, "Iconix Brand Group Part 1: The Growth In

Revenue And Earnings Was Driven By Increasing Sales Of Assets And Non-Cash Gains."

Therein, the article stated, in relevant part:

- Recent correction of past cash flow statements revealed a declining operating cash flow.

- The growth in revenue and earnings in the past years was driven by increasing sale of asset and "non-cash gain" from book value adjustment.

- The amount of "gain" from brand sale is determined by the cost basis assignment, which was under-reported with questionable accounting practices, especially when joint venture was formed.

- Non-cash gain was realized through a re-measurement of book value, despite a net capital loss.

72.     On April 15, 2015, just before the market closed, *Seeking Alpha* published the second article in the series, entitled "Iconix Brand Group Part 2: The Diminishing Earnings Power Of Iconix Brands."  Despite the Company's aggressive acquisitions and increasing leverage, the article provided quantitative evidence that the real earnings power of the Iconix brands has been diminishing, with negative growth rates of licensing revenue, earnings, licensing return, gross retail sale, *etc.*

73.     On this news, shares of Iconix declined $1.27 per share from $33.30 per share on April 15, 2015, to close on April 17, 2015 at $32.03 per share, a two-day decline of nearly 4 percent on unusually heavy volume.

74.     On April 17, 2015, towards the end of the trading day, *Seeking Alpha* published the third and final article about Iconix, alleging in detail how the majority of the Company's brands have diminished in value since Iconix acquired them.

75.     Additionally, on April 17, 2015, after the market closed, Iconix issued a press release announcing the Company's COO had resigned after only serving for approximately one year. Therein, the Company, in relevant part, stated:

21

Seth Horowitz, Chief Operating Officer ("COO") of Iconix Brand Group, Inc. (the "Company"), tendered his resignation on April 13, 2015. Mr. Horowitz served as COO for approximately one year. The Company does not intend to seek a new COO at this time. Mr. Horowitz's responsibilities are now being assumed by the broader Iconix team.

76.     Thereafter, on April 20, 2015, Roth Capital Partners published an Equity Research Note titled, "ICON: COO Departure Creates Greater Uncertainty; Lowering Target To $36." The Note stated, in relevant part:

> News of the Coo's resignation is likely to weigh on shares near-term, particularly following the CFO's recent departure as well as uncertainties surrounding the company's prior reporting of free cash flow and practice of booking joint venture gains as revenue.

> \*       \*       \*

> "**Increasing Uncertainty.** This announcement follows the March 30 resignation of chief financial officer, Jeff Lupinacci, who will pursue another business opportunity. While not necessarily connected, Lupinacci's departure came after uncertainties surrounding the company's reporting of free cash flow.

77.     On these disclosures, shares of Iconix declined $6.62 per share, or 20.67 percent, to close at $25.41 per share on April 20, 2015 on unusually heavy volume.

78.     With the suspicion of accounting improprieties swirling in the market, cracks in the façade began to appear in the Company's reported results.  On April 29, 2015, Iconix issued a press release announcing its financial results for the first quarter ended March 31, 2014. Therein, the Company announced Q1 licensing revenue of $95.4 million, a 15% decrease as compared to approximately $112.2 million in the first quarter of 2014; non-GAAP diluted EPS of $0.54, a 27% decrease as compared to $0.74 in the prior year quarter; and free cash flow of approximately $30.1 million, a 39% decrease as compared to the prior year quarter of approximately $49.4 million.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.2 million for Q1.

79. Despite reporting disappointing Q1 results, the Company maintained its revenue, non-GAAP diluted EPS and free cash flow guidance for full-year 2015.

80. On May 8, 2015, Iconix filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter. The Company's Form 10-Q was signed by defendants Cole and Blumberg, and reaffirmed the Company's statements previously announced on April 29, 2015. The Form 10-Q also contained certifications signed by defendants Cole and Blumberg pursuant to SOX substantially similar in all material respects to those set forth in ¶ 48, *supra*.

**The Full Truth Regarding Iconix's Questionable Accounting Practices Is Revealed**

81. On August 6, 2015, after the close of the trading session, the Company announced in a press release that its founder and CFO, defendant Cole, had resigned effective immediately. According to the press release, Cole served as the Company's CEO, Chairman, and President since he founded Iconix in 2005.

82. On this news, Iconix's stock price dropped $4.68 per share, or 23.88 percent, to close at $14.92 per share on August 7, 2015 on unusually high volume.

83. Finally, on August 10, 2015, prior to the open of the trading session, Iconix released disappointing results for the second quarter ended June 30, 2015 and drastically cut its full year guidance. Quarterly revenues missed consensus estimates by 14 percent, and quarterly earnings missed by 13 percent. While licensing revenue for the second quarter was approximately $98.5 million, a 1% increase as compared to approximately $97.5 million in the second quarter of 2014, the Company did not report any "Other revenue" in the quarter, as compared to approximately $21.4 million of Other revenue recorded in the second quarter of 2014 related to the sale of the Sharper Image e-commerce business and a transaction related to our Southeast Asia joint venture.

84.     In connection with its results, Iconix also reported that the SEC has been inquiring about the Company's accounting for joint venture transactions.  In an accompanying press release, the Company disclosed that the SEC was reviewing its "accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results."  Iconix also revealed that its board had formed an independent committee to review this questionable accounting.  The Company warned that it may ultimately be forced to reverse certain gains it had recognized on its historical joint venture transactions and that the specific amounts that could be reversed as a result of improper accounting were estimated to be $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012.

85.     In reaction to these revelations, Iconix's stock price declined $0.35 per share, or 2.3 percent, to close at $14.57 per share on August 10, 2015 on extremely high volume.

86.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company had underreported the cost basis of the Licensing Rights to certain brands;

(b)     the Company engaged in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic growth;

(c)     as a result, the Company's earnings and revenues were overstated; and

(d)     as a result of the foregoing, Defendants' statements about the Company's business, operations, and future business prospects were materially false and misleading and/or lacked a reasonable basis.

87.     As a result of Defendants' false statements, Iconix's securities traded at artificially inflated prices during the Class Period.  However, as the truth about Iconix's accounting practices was gradually revealed to investors, the Company's share price dramatically declined.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the securities of Iconix between February 20, 2013 and August 7, 2015, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Iconix, and the directors and officers of Iconix and their families and affiliates at all relevant times.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 24, 2015, Iconix had 47,863,080 shares of common stock outstanding.

90.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Iconix securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

91.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

92.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION

94.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Iconix securities, and operated as a fraud or deceit on Class Period purchasers of Iconix securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Iconix securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Iconix securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

95.     Iconix's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

96.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Iconix who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## ADDITIONAL ALLEGATIONS REGARDING SCIENTER

97.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

98.     The Individual Defendants permitted Iconix to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

99.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Iconix, their control over, receipt, and/or modification of Iconix's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Iconix, participated in the fraudulent scheme alleged herein.

100.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Iconix common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Iconix's business, operations, and management and the intrinsic value of Iconix securities and caused Plaintiff and members of the Class to purchase Iconix securities at artificially inflated prices.

## PRESUMPTION OF RELIANCE

101.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Iconix securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

102.    At all relevant times, the markets for Iconix securities were efficient for the following reasons, among others:

        (a)    as a regulated issuer, Iconix filed periodic public reports with the SEC;

        (b)    Iconix regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

        (c)    Iconix was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

        (d)    Iconix common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "ICON."

103.    As a result of the foregoing, the market for Iconix securities promptly digested current information regarding Iconix from all publicly available sources and reflected such information in Iconix's stock price.  Under these circumstances, all purchasers of Iconix securities during the Class Period suffered similar injury through their purchase of Iconix's securities at artificially inflated prices and the presumption of reliance applies.

104.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

105.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 104 by

reference.

106.    During the Class Period, Defendants disseminated or approved the false

statements specified above, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

107.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that

they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a

fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of

Iconix securities during the Class Period.

108.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity

of the market, they paid artificially inflated prices for Iconix securities.  Plaintiff and the Class

would not have purchased Iconix securities at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading

statements.

109.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Iconix securities during the Class Period.

### COUNT  II

**For Violation of Section 20(a) of the Exchange Act**
**<u>Against the Individual Defendants</u>**

110.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 109 by reference.

111.    The Individual Defendants acted as controlling persons of Iconix within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Iconix, the Individual Defendants had the power and ability to control the actions of Iconix and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

DATED:  August 21, 2015

Respectfully submitted,

Christopher J. Keller (CK-2347)
Michael W. Stocker (MS-1309)
Francis P. McConville (FM-4233)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ckeller@labaton.com
mstocker@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff*
*Haverhill Retirement System*

## CERTIFICATION

I, Sheryl Trezise, as Administrator of Haverhill Retirement System ("Haverhill") hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Haverhill. I have reviewed a complaint prepared against Iconix Brand Group, Inc. ("Iconix"), alleging violations of the federal securities laws;

2.     Haverhill did not purchase securities of Iconix at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Haverhill is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     Haverhill's transactions in Iconix securities during the Class Period are reflected in Exhibit A, attached hereto;

5.     Haverhill has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

*Haverhill Retirement System v. Impax Laboratories, Inc.*, No. 13-cv-01566 (N.D. Cal.) (filing plaintiff)

6.     Beyond its pro rata share of any recovery, Haverhill will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _21ˢᵗ_ day of August, 2015.

_____
*Sheryl Trezise*
*Administrator of Haverhill Retirement System*

## EXHIBIT A

## TRANSACTIONS IN ICONIX BRAND GROUP, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/22/2014 | 1,057.00 | $33.80 | ($35,724.17) |
| Sale | 5/21/2015 | -25.00 | $26.51 | $662.75 |
| Sale | 7/23/2015 | -5.00 | $23.09 | $115.45 |
| Purchase | 7/29/2015 | 418.00 | $21.64 | ($9,045.39) |
| Sale | 7/31/2015 | -17.00 | $21.65 | $368.05 |
| Sale | 8/7/2015 | -735.00 | $14.31 | $10,514.32 |